Filed 5/14/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIME GUADALUPE GONZALEZ,<br><br>    Defendant and Appellant. | G047199<br><br>(Super. Ct. No. 11ZF0111)<br><br>MODIFICATION ORDER; NO CHANGE IN JUDGMENT |

The opinion filed April 30, 2014 is modified on page 11 so that the citation, "(*People v. Martin* (2013) 222 Cal.App.4th 98, 103, review granted on Mar. 26, 2014, S216139.)," is deleted.

The modification does not change the judgment.

ARONSON, ACTING P. J.

I CONCUR:

THOMPSON, J.

Filed 4/30/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>    v.<br><br>JAIME GUADALUPE GONZALEZ,<br><br>  Defendant and Appellant. | G047199<br><br>(Super. Ct. No. 11ZF0111)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge. Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Lise Jacobson and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jaime Guadalupe Gonzalez of first degree murder (count 1; Pen. Code, § 187, subd. (a); all further undesignated statutory references are to this code) and street terrorism (count 2; § 186.22 ,subd. (a)) for killing 20-year-old Juan Carlos Cena. The jury found true a special circumstance allegation that Gonzalez, who was 15 years old at the time of the offense, intentionally committed the murder for a criminal street gang purpose (§ 190.2, subd. (a)(22)), and found true a gang penalty enhancement allegation (§ 186.22, subd. (b)(1)). The jury also found Gonzalez was a principal in committing a gang offense involving the intentional discharge of a firearm causing death (§ 12022.53, subds. (d) & (e)(1)). The trial court sentenced Gonzalez to a term of 50 years to life for count 1, consisting of 25 years to life for first degree murder and a consecutive 25-years-to-life term for the firearm use enhancement. The court stayed under section 654 Gonzalez's street terrorism sentence on count 2. Gonzalez now contends his youth at the time of the offense renders his lengthy sentence cruel and unusual punishment in violation of the federal and state Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. 1, § 17.)

He relies on *Miller v. Alabama* (2012) __ U.S. __, 132 S.Ct. 2455 (*Miller*), which precludes for juvenile offenders a mandatory sentence of life in prison without the possibility of parole (LWOP). Gonzalez argues the mandatory term the trial court imposed is tantamount to an LWOP sentence based on actuarial tables showing a life expectancy in his mid-70's, which he asserts is overstated given the dangers of prison life. In any event, he contends his sentence is unconstitutional because it denies him the possibility of any meaningful period outside prison on parole if he demonstrates rehabilitation. His core premise is mistaken, however. He does not face LWOP. New legislation effective January 1, 2014,[1] provides for a parole hearing for juvenile offenders

---

[1]     Senate Bill No. 260 (2013-2014 Reg. Sess.) September 16, 2013 (SB 260), codified at § 3051.

2

like Gonzalez in the 25th year of their incarceration, usually within their life expectancy by a matter of decades and therefore well within constitutional norms. We also find no merit in Gonzalez's as-applied, disproportional punishment challenge or his ineffective assistance of counsel claim. We therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2003, Gonzalez shot and killed Cena in a second encounter after two of Cena's friends dropped him off near an Anaheim intersection. According to Cena's friends, Cena planned to sell shampoo they had stolen from a store so they could use the proceeds to buy drugs. The trio belonged to the Kodiak criminal street gang, while Gonzalez belonged to Kodiak's rival, the Underhill gang. In an initial encounter, Cena's friends saw Gonzalez and a companion engage Cena in a conversation that did not appear friendly, "but there was no yelling." Cena returned safely to his friends' truck, and they dropped him off at the Balsom and Curtis intersection. Before the truck could make a u-turn to retrieve Cena, two shots rang out, felling Cena. The police and an ambulance responded, but Cena never regained consciousness and bled to death from his injuries.

More than a year later, Gonzalez's mother discovered a firearm in his possession and turned it over to the police. A ballistics test at the time did not connect the weapon, which had a damaged barrel, to Cena's shooting. Gonzalez admitted in a police interview only that he had received the gun as an Underhill gang member trying to earn his "stripes," and that he had used it to fire shots in the air to scare off rival La Jolla gang members in a different incident.

In 2009, a fellow gang member identified Gonzalez as the person who shot Cena and agreed to wear a recording device while he briefly shared a jail cell with Gonzalez, who was incarcerated on other charges. But Gonzalez admitted in the

3

recording only that he possessed the handgun his mother discovered. The gang associate, however, also identified Gonzalez's accomplice on the day of the shooting, Ricardo Castaneda.

In May 2011, officers arrested Castaneda on an outstanding traffic warrant, he admitted his role in the shooting, and at trial in May 2012, Castaneda identified Gonzalez as the shooter. A new ballistics test conducted with the aid of 3-D printing technology to account for the damaged barrel on Gonzalez's gun confirmed the weapon matched the bullet retrieved when Cena died on a hospital gurney. The jury convicted Gonzalez as noted, and the trial court held a sentencing hearing in July 2012.

At the time of sentencing, Gonzalez was 23 years old and already serving an 11-year sentence for assaulting a police officer with a firearm. The trial court imposed a 50-years-to-life sentence and ordered it to run concurrently with Gonzalez's 11-year assault sentence. The trial court credited Gonzalez with just over a year of pretrial incarceration, 372 days, and Gonzalez now appeals his 50-years-to-life sentence.

II

DISCUSSION

A. *General Principles and Standard of Review*

Punishment that is grossly disproportionate to the offender's culpability violates constitutional norms prohibiting "cruel and unusual" (U.S. Const., 8th amend.) and "cruel or unusual" (Cal. Const., art. I, § 17 ) punishment. (See, e.g., *Harmelin v. Michigan* (1991) 501 U.S. 957, 997 (*Harmelin*) (conc. opn. of Kennedy, J.) [8th Amend. "encompasses a narrow proportionality principle"]; *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*) ["punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed"].) Because "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments" (*In re*

4

*Lynch* (1972) 8 Cal.3d 410, 414 (*Lynch*), a defendant bears a "considerable burden" to show the requisite disproportionality. (*People v. Wingo* (1975) 14 Cal.3d 169, 174 (*Wingo*).) Consequently, such findings "have occurred with exquisite rarity in the case law" (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196).

B.      *Categorical Rules Governing Punishment and Process in the Juvenile Context*

In the juvenile context, because "juvenile offenders cannot with reliability be classified among the worst offenders" (*Roper v. Simmons* (2005) 543 U.S. 551, 569 (*Roper*)), certain "categorical rules" (*Graham v. Florida* (2010) 560 U.S. 48, 61 (*Graham*)) have emerged to mitigate the risk of disproportionate punishment. As *Graham* explained, "The Court's cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." (*Id.* at p. 59.) In *Graham*, the high court extended its categorical approach to bar LWOP sentences for juveniles in nonhomicide cases. (*Id.* at p. 61 ["The present case involves an issue the Court has not considered previously: a categorical challenge to a term-of-years sentence"].)

The high court cautioned its categorical approach in *Graham* was not "suited for considering a gross proportionality challenge to a particular defendant's sentence" on an as-applied basis, but instead applies "[w]here a sentencing practice itself is in question." (*Graham*, *supra*, 560 U.S. at p. 61 ["This case implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes"].)

The Supreme Court's categorical line of cases has yielded several bright-line rules. The death penalty may not be imposed on juvenile offenders. (*Roper*, *supra*, 543 U.S. at p. 578.) An LWOP sentence may not be imposed on a juvenile who commits

5

a nonhomicide offense. (*Graham*, 560 U.S. at p. 82.) Similarly, our Supreme Court has explained that a de facto LWOP sentence, including for example a sentence of 110-years-to-life, is constitutionally barred in juvenile nonhomicide cases. (*People v. Caballero* (2012) 55 Cal.4th 262, 268-269 (*Caballero*).)

*Miller* recently established another bright-line rule in the juvenile context: a *mandatory* LWOP sentence may not be imposed on a juvenile even in homicide cases because the sentencing court must "take into account how children are different, and how those differences counsel against *irrevocably* sentencing them to a lifetime in prison." (*Miller*, *supra*, 132 S.Ct. at p. 2469, italics added.) Gonzalez relies heavily on *Miller*, and we therefore explore it in some depth.

In *Miller*, the high court noted, "Our decision does not categorically bar a penalty for a class of offenders or type of crime — as, for example, we did in *Roper* or *Graham*." (*Miller*, 132 S.Ct. at p. 2471.) The court emphasized it did not reach the defendants' "argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." (*Id.* at p. 2469.) "Instead," the court's decision in *Miller* "mandates only that a sentencer follow *a certain process* — considering an offender's youth and attendant characteristics — before imposing a particular penalty." (*Id.* at p. 2471, italics added.)

*Miller*'s emphasis on a constitutionally adequate process traces back to the high court's jurisprudence in death penalty cases, where the court held capricious infliction of the state's most severe penalty violates the Eighth Amendment. (See, e.g., *Furman v. Georgia* (1972) 408 U.S. 238, 309 (conc. opn. of Stewart, J.) ["These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual"]; see also *Solem v. Helm* (1983) 463 U.S. 277, 294 (*Solem*) ["the death penalty is different from other punishments in kind rather than degree"].)

*Miller* observed that just as the Eighth Amendment requires the heightened procedural safeguard of individual sentencing consideration because "'death is different,'

6

children are different too." (*Miller*, *supra*, 132 S.Ct. at p. 2470.) The court therefore held individualized consideration is similarly necessary before an LWOP sentence may be imposed on a juvenile. "[T]he Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders." (*Id.* at p. 2469, italics added.) A sentencing process mandating a blind eye to the very factors that make juveniles different is arbitrary and capricious in light of the irrevocable penalty at stake. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." (*Ibid.*)

The court in *Miller* acknowledged its precedent did not require individualized sentencing in noncapital cases involving adults. (*Miller*, *supra*, 132 S.Ct. at p. 2470, citing *Harmelin*, *supra*, 501 U.S. 957 [upholding mandatory life-without-parole term for adult convicted of possessing more than 650 grams of cocaine].) But as *Miller* explained, just as children are different from adults, an LWOP term is distinct from other sentences in its severity for children. In *Graham*, for example, the court recognized that for juveniles an LWOP "share[s] some characteristics with death sentences that are shared by no other sentences," primarily as a "forfeiture that is irrevocable." (*Graham*, *supra*, 560 U.S. at p. 69-70 ["this sentence 'means denial of hope'"].)

While an LWOP sentence is for an adult "far more severe" than any other term of years (*Solem*, *supra*, 463 U.S. at p. 297), it is even more so for a juvenile. "Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." (*Graham*, 560 U.S. at p. 70.) Thus, while a defining characteristic of youth is its malleability, an LWOP sentence "'means that good behavior and character improvement

7

are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile convict], he will remain in prison for the rest of his days.'" (*Ibid.*)

Accordingly, observing "it is no surprise that the law relating to society's harshest punishments recognizes . . . a distinction" for children, the court in *Miller* held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." (*Miller*, *supra*, 132 S.Ct. at pp. 2470, 2475.) Absent such consideration, the defendants in *Miller* gained an automatic reversal of their LWOP sentences. As the court explained, "By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." (*Id.* at p. 2475.)

In effect, *Miller* and *Graham* recognize that LWOP sentences are for juveniles analogous to the death penalty for adults. Consequently, the Constitution requires individualized consideration of the distinctive mitigating features of a minor's age and attendant circumstances, just as it requires an individualized assessment of a death penalty defendant's culpability and character.

*Miller*, *Graham*, *Roper*, and *Caballero* all derive their bright-line rules from the fundamental distinction that juveniles, "'"particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults,"'" and therefore may "'"deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms . . . ."'" (*Thompson v. Oklahoma* (1988) 487 U.S. 815, 834; see also *In re Nunez* (2009) 173 Cal.App.4th 709, 729 [noting supporting scholarly research, including that "'the steepest inflection point in the development curve occurs sometime between [age] 16 and 19 years'"].)

Based on these differences, the high court observed in *Roper*: "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. [Citation.] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." (*Roper*, *supra*, 543 U.S. at p. 570.)

These observations also informed *Graham*, *Caballero*, and *Miller*, for as the court explained in *Miller*, imposing "[m]andatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." (*Miller*, *supra*, 132 S.Ct. at p. 2468.)

C.      *Gonzalez Is Not Entitled to Automatic Reversal under the Foregoing Rules*

Gonzalez relies principally on *Miller*, which was decided about a month before his sentencing hearing. He claims he falls within *Miller*'s proscription against mandatory LWOP sentences because the applicable sentencing and enhancement scheme mandated his sentence of 50-years-to-life, and that sentence amounts to a de facto LWOP. Specifically, he notes his sentence of 25 years to life for murder is mandatory.

9

(§§ 190, 190.2, subd. (a)(22), 190.5; see *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17 (*Demirdjian*) ["For juveniles under 16 who were 14 or 15 when the crime was committed, a life term without the possibility of parole is not permitted, leaving a term of 25 years to life *with* possibility of parole"].)  And the consecutive enhancement of 25 years to life for discharging a firearm causing death is also mandatory.  (§ 12022.53, subd. (d).)  Because the mandatory length of his sentence amounts to an LWOP term, Gonzalez asserts he is entitled to reversal and on remand an individualized sentencing determination, as in *Miller*.

While *Miller* involved an actual LWOP sentence and not as here an assertedly de facto LWOP term, *Miller* acknowledged the reasoning in *Graham* "implicates *any* life-without-parole sentence imposed on a juvenile," including a sentence imposed on a juvenile convicted of murder.  (*Miller*, *supra*, 132 S.Ct. at pp. 2465-2466, italics added; cf. accord, *Caballero*, *supra*, 55 Cal.4th at p. 268-269 [applying *Graham*'s rationale to bar de facto LWOP sentences for juveniles in nonhomicide cases].)  Indeed, while the high court in *Miller* was careful to emphasize *Graham*'s "categorical bar" against juvenile LWOP sentences applied "only to nonhomicide crimes" (*Miller*, at p. 2465), the court also observed that "none of what [*Graham*] said about children — about their distinctive (and transitory) mental traits and environmental vulnerabilities — is crime-specific. . . .  So *Graham*'s reasoning implicates *any life-without-parole sentence* imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." (*Miller*, at p. 2465, italics added; accord, *Caballero*, at p. 267.)  Thus, *Caballero* held a de facto LWOP term implicates the same constitutional considerations that barred in *Graham* an actual LWOP sentence for juveniles in nonhomicide cases.  (*Caballero*, at p. 267.)

We see no reason the same analysis should not apply to bar mandatory de facto juvenile LWOP terms in homicide cases.  The reasoning in *Miller* extends not

10

just to mandatory sentences that impose an actual LWOP term on a juvenile, but also to mandatory sentences tantamount to an LWOP term.

Gonzalez contends his sentence amounts to a de facto LWOP term. He argues that because he was sentenced at age 23, with credit for a year of time served, then even assuming he is eligible for parole after serving 50 years will, at age 72, push him close to the brink of a life expectancy of 76 years. He obtains this figure from *People v. Mendez* (2010) 188 Cal.App.4th 47, 63, involving the projected life expectancy of an 18-year-old defendant. We note that life expectancy projections derived on appeal vary widely in recent juvenile LWOP cases. In another recent case the projected life expectancy of a 17-year-old male defendant was only 64.6 years. (*People v. Martin* (2013) 222 Cal.App.4th 98, 103, review granted on Mar. 26, 2014, S216139.) In *People v. Solis* (2014) __ Cal.App.4th __ [2014 WL 935319, *4, fn. 2], another 17-year-old defendant requested and was granted judicial notice on appeal of actuarial tables showing a life expectancy of 72 years. Other actuarial projections are as high as 80 years. (See National Center for Health Statistics, Centers for Disease Control and Prevention, National Vital Statistics Reps. (Jan. 11, 2012) vol. 60, no. 4, table 6, p. 28.) Had Gonzalez faced trial and the consequences of his conviction promptly at age 15, he would be eligible for parole under a 50-year sentence around age 65, well within an 80-year life span.

Gonzalez contends all actuarial estimates overstate his life expectancy "because he is incarcerated," and therefore his life span "in reality . . . may be considerably shorter." (See *Solis*, *supra*, __ Cal.App.4th __ [2014 WL 935319, *4] ["considering the health hazards associated with prison life," an estimated life expectancy of 72 years "may actually be optimistic"].) Gonzalez cites a source "discussing persistent problems in United States prisons of 'rape, gang violence, the use of excessive force by officers, [and] contagious diseases'" (The Commission on Safety and Abuse in America's

11

Prisons, Confronting Confinement (June 2006) p. 11 <www.vera.org/pubs/confronting-confinement> [as of March 21, 2014].)

Gonzalez also suggests that life prisoners rarely obtain parole on their first opportunity and therefore, based on his asserted life expectancy of 76 years, an initial parole hearing at age 72 is too late to ensure a "meaningful" chance "to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75.) As Gonzalez phrases it, "A handful of years is *not* substantial." Absent a meaningful period of potential release on parole, Gonzalez argues his sentence is tantamount to an LWOP. (See *People v. Perez* (2013) 214 Cal.App.4th 49, 57 (*Perez*) ["There is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole," original italics].)

Gonzalez further argues his minimum 50-year sentence does not accurately reflect the time he will serve before he is eligible for parole because the Board of Parole Hearings (Parole Board) calculates a "base term" (Cal. Code Regs., tit. 15, § 2403(a)) for parole eligibility that "adds several more years to the determinate portion of the sentence based on the nature of the murder and the victim involved." According to Gonzalez, "Depending on where the particular offense falls in the matrix of base terms, [a Parole Board] panel fixes the base term, typically . . . considering mitigating and aggravating circumstances. Here, the murder of a person not well known to appellant and whose death was fairly immediate" yields under "the matrix of base terms for first degree murder" (see Cal. Code Regs., tit. 15, § 2403(b)) a "base term range [of] 28-29-30 years." Gonzalez elaborates: "Assuming the panel would select the middle term of 29 years for appellant's case, added to which is the additional minimum term of 25 years for the gun use, that is a *minimum* of 54 years appellant will be required to serve before being considered eligible to actually be released on parole. So in reality, appellant will be about 78 years old at that point, two years past an optimistic life expectancy of 76 years."

12

Gonzalez's calculation, however, ignores the eight years he escaped accountability and defied justice. This is particularly true given he demonstrated no hint of remorse or reform in that time. To the contrary, he promptly reoffended by pointing a firearm at a peace officer and continued to menace society by committing other felonies. It would be a perverse incentive indeed to count that period towards Gonzalez's release instead of against it.

In any event, Gonzalez's calculations are fatally flawed for another reason, as we explain.

D.    *SB 260*

Gonzalez's challenge under *Miller* fails because SB 260 effectively modifies his sentence to afford him a parole date well within his life expectancy. SB 260 specifies in its preamble: "The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.Ed.2d 407." (Stats. 2013, ch. 312, § 1.)

Specifically, SB 260 provides in new section 3051, subdivision (b)(3), for a parole hearing in the 25th year of incarceration for juvenile offenders like Gonzalez, sentenced to prison for a term of 25 years-to-life or longer. Gonzalez will enter his 25th year of incarceration and receive under the statute a parole hearing when he is 46 years old. That affords Gonzalez a substantial parole period outside prison if he demonstrates

reform, even under the earliest end-of-life projections. Consequently, Gonzalez's incarceration, although lengthy and under a mandatory sentence, does not implicate *Miller*'s per se ban on mandatory LWOP terms for juveniles. He similarly falls outside *Caballero*'s holding that de facto LWOP terms may be tantamount to an LWOP for constitutional purposes. Simply put, under the new legislation, Gonzalez does not face the prospect of life in prison without the possibility of parole. Therefore, *Miller* does not apply, and neither does *Caballero*'s recognition that a lengthy term of years may amount to an LWOP sentence.

The court in *In re Heard* (2014) 223 Cal.App.4th 115 (*Heard*) recently reached a contrary conclusion concerning the relevance of SB 260. There, the trial court sentenced a juvenile defendant to 80 years to life for two nonhomicide offenses he committed when he was 15 years old, plus a consecutive 23-year term for an unrelated voluntary manslaughter he committed at age 16. On appeal, the *Heard* court explained SB 260 did not alleviate its constitutional concerns about the length of the juvenile's sentence. The court found persuasive the defendant's contentions "he is not guaranteed to receive an opportunity to avail himself of SB 260," given it could be repealed, and "SB 260's passage does not remedy the sentencing court's failure to consider the

14

mitigating circumstances of Heard's youth, as required by *Miller*, *supra*, 132 S.Ct. 2455."[2] (*Heard*, *supra*, 223 Cal.App.4th at pp. 128-129.)

In our view, these contentions in *Heard* do not suffice to disregard the parole opportunity SB 260 affords to juvenile offenders. First, while SB 260 theoretically may be repealed or modified in the future, that is true of all legislation. It is speculative to suppose the law may change before Gonzalez's parole hearing, and we therefore must consider the law and its constitutional effect as we find it, according to its present terms. Notably, SB 260 is a statutory provision, and therefore does not establish its 25-year parole hearing date as a constitutional minimum or maximum. If the Legislature later liberalizes parole consideration for youthful offenders still further with an earlier hearing date (cf. § 1170, subd. (d)(2) [providing for recall of juvenile LWOP sentences at 15, 20, or 24 years, upon specified showing]), or if the Legislature instead

---

[2]    We note *Heard* may not have needed to address the effect of the homicide sentence in that case under *Miller*, since the 80-year sentence for the juvenile's nonhomicide offenses constituted a de facto LWOP and therefore ran afoul of *Caballero*. (See *Caballero*, *supra*, 55 Cal.4th at p. 268 ["'flat ban' on life without parole sentences applies to all nonhomicide cases"]; *id.* at pp. 270-271 (conc. opn. of Werdeger, J.) [explaining that attempt offenses fall outside bright line of homicide, and therefore the nonhomicide offense of attempted murder may not subject juvenile to a de facto LWOP].)

Of course, had the court in *Heard* remanded for resentencing solely on the nonhomicide offenses, there remained the possibility the trial court might impose a still-lengthy sentence that, in combination with the 23-year determinate homicide term, would result in a de facto LWOP. For example, if the trial court halved the 80-year indeterminate term to 40 years to life, that sentence plus the 23-year term would render the defendant ineligible for parole for 63 years, *if the trial court exercised its discretion to run the homicide and nonhomicide sentences consecutively*.

That discretion, however, would distinguish the case from *Miller*, where the mandatory nature of the LWOP required per se reversal. As noted, *Miller* did not bar discretionary imposition of an LWOP for homicide offenses, and the question on appeal in such a case would therefore be whether the trial court in imposing an LWOP abused its discretion in concluding the juvenile was irrevocably depraved. (See *Miller*, *supra*, 132 S.Ct. at p. 2469 [noting "the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption'"].)

15

restricts SB 260 to afford a parole hearing after 35 years of incarceration instead of in the 25th year, reviewing courts will assess those changes in due course.

Second and related, given the parole opportunity afforded by SB 260, the state has not subjected Gonzalez to the penalty proscribed in *Miller*: mandatory life imprisonment without the possibility of parole. In effect, the reversal in *Heard* compels judicial fine tuning of a defendant's sentence even though the Legislature in section 260 has set a parole date within constitutional norms. We therefore find too broad and unmoored from high court authority the remedy of per se reversal adopted in *Heard* for a "sentencing court's failure to consider the mitigating circumstances of [the defendant]'s youth, as required by *Miller*. . . ." (*Heard*, *supra*, 223 Cal.App.4th at p. 129.) As noted, the bright-line rules resulting in reversal in *Miller* and its antecedents turned on the constitutional danger of gross disproportionality in irrevocably subjecting juveniles to the harshest penalties available by law: the death penalty in *Roper*, LWOP for nonhomicide offenses in *Graham*, and mandatory LWOP in *Miller*. The same was true in *Caballero* for a de facto LWOP in nonhomicide cases.

Outside of these narrowly-defined contexts, the presumption applies that the Legislature in enacting prescribed penalties and trial courts in imposing them have each acted within constitutional bounds. (*Wingo*, *supra*, 14 Cal.3d at p. 174.) Reviewing courts therefore do not have roving authority to order remand to fine tune a juvenile defendant's sentence with strict proportionality to his or her culpability and prospects for reform. As a panel of this court explained in *Perez*, "There is no rule of constitutional authority that *requires discretion* to reduce penalties when minors are sentenced for adult crimes to periods which still leave them a substantial life expectancy after release from prison." (*Perez*, *supra*, 214 Cal.App.4th at p. 52, original italics.)

In other words, *Roper*, *Miller*, *Graham*, and *Caballero* "do not apply to sentences which leave the possibility of a substantial life expectancy after prison, i.e., are not 'de facto' LWOP's or 'functional' LWOP's." (*Perez*, *supra*, 214 Cal.App.4th at

16

p. 52.)  To conclude otherwise would put in question every mandatory sentencing provision and effectively prohibit determinate sentencing in favor of judicially-calibrated individualized sentencing, usurping the Legislature's role.  To the contrary, however, reviewing courts must "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminal."  (*Solem*, *surpa*, 463 U.S. at p. 290.)

*Perez* did not involve the prospect of life in prison without parole because the defendant's two consecutive sentences of 15 years to life for offenses he committed at age 16 made him eligible for parole no later than age 47.  (*Perez*, *supra*, 214 Cal.App.4th at pp. 51-52.)  Accordingly, *Perez* held the per se rule of reversal in *Miller* and its line of cases did not apply.  Here, we similarly cannot ignore that under SB 260 Gonzalez will be eligible for parole in his 25th year of incarceration when he is 46 years old.  He does not face the prospect of life in prison without the possibility of parole.  Consequently, *Miller*'s per se reversal based on imposition of a mandatory, irrevocable LWOP has no applicability here.  We therefore part company with *Heard* to the extent it required remand for the trial court to fine tune the defendant's sentence based on his youth, even though under SB 260 his effective prison term was no longer tantamount to an LWOP.

True, Gonzalez's sentencing postdated *Miller* and predated SB 260.  Imposition of a mandatory LWOP at the time Gonzalez was sentenced, without consideration of his youth and without the ameliorating effect of SB 260, constituted error.  SB 260, however, cured or rendered moot any error under *Miller* in the sentencing hearing Gonzalez received.

Gonzalez argues that *if* SB 260 is repealed, he will have lost the opportunity "to present an accurate picture of his or her individual characteristics at the time of the offense," and even if there is no repeal or modification, it will be more difficult "years down the road at a parole suitability hearing" to show his diminished culpability at the

17

time of the offense based on his long-past youth. This challenge fails for two reasons. First, the presentence or probation report, trial proceedings, and record of any pretrial hearings or police investigation often describe a defendant's youthful characteristics or other mitigating circumstances. Moreover, it is the defendant's responsibility to make a record of mitigating circumstances and, if this is not done at trial or sentencing, to do so in making a record for relief on habeas corpus. SB 260 does not alter the defendant's responsibility to make this record; nor would its repeal.[3]

Second, we emphasize the particularized, as-applied considerations Gonzalez raises are outside the domain of the bright-line challenges addressed in *Roper*, *Graham*, *Miller*, and *Caballero*. As noted, SB 260 necessarily affects our review because with the parole eligibility it affords, Gonzalez does not face the prospect of irrevocable imprisonment that triggered reversal in those cases. Of course, the constitutional prohibition against cruel and unusual punishment is not limited to the circumstances identified in *Miller* and its antecedents. As noted in *Perez*: "[Q]uite apart from *Miller*, *Graham*, *Roper*, or *Caballero*," a defendant's claim of disproportional punishment based on the diminished culpability of youth may amount to a claim "his sentence must be reduced under the older California Supreme Court jurisprudence of gross disproportionality, as shown primarily in *Lynch*, *supra*, 8 Cal.3d 410 and *Dillon*, *supra*, 34 Cal.3d 441." (*Perez*, *supra*, 214 Cal.App.4th at p. 60.) The federal Constitution provides for a similar review for "'extreme sentences that are "grossly disproportionate"

---

[3] We observe that the delayed consideration of a defendant's youth under SB 260 affords the juvenile time to build a mitigating record and demonstrate rehabilitation. The delay also ameliorates the "great difficulty," given the malleability of youth, posed in accurately assessing at the outset in a sentencing hearing a youthful offender's prospects for reform. (*Miller*, *supra*, 132 S.Ct. at p. 2469 [noting problem "of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption'"].)

18

to the crime.'"  (*Ewing v. California* (2003) 538 U.S. 11, 23.)  We now turn to those claims.

E.      *As-Applied and IAC Challenges*

Gonzalez contends his LWOP sentence does not reflect his actual culpability and prospects for reform.  An as-applied challenge is subject to forfeiture, however, and Gonzalez did not raise the issue of cruel and unusual or disproportionate punishment below.  Specifically, a challenge based on the particular characteristics of the defendant or the offense may be forfeited by failing to raise it.  (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; *Demirdjian*, *supra*, 144 Cal.App.4th at p. 13 [correct term "is forfeiture, not waiver"].)  Forfeiture is particularly appropriate where resolution of factual issues is necessary to determine whether the sentence is grossly disproportionate to the offender's culpability.  (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583.)  Nevertheless, an appellate court may reach the issue on the record presented (*Demirdijian*, at p. 14), often "'in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel [IAC] claim.'"  (*People v. Em* (2009) 171 Cal.App.4th, 964, 971, fn. 5.)

Here indeed, Gonzalez asserts an IAC claim based on counsel's failure to object to "the statutorily-mandated sentence . . . in view of appellant's individual characteristics."  As Gonzalez phrases it:  "Neither did counsel develop the record by supplying evidence of appellant's upbringing, family dynamics, educational difficulties, or peer pressures, though some of that information is contained in the overall record from the trial."  While *Miller* may have suggested to competent counsel the importance of challenging even mandatory sentences for juvenile homicide defendants, we do not resolve the IAC claim on that ground.  To prevail on a claim counsel rendered constitutionally defective assistance, the challenger must show his attorney's representation fell below an objective standard of reasonableness *and* that he suffered prejudice as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*);

19

*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) Prejudice arises only if there is a reasonable probability of a more favorable result absent counsel's failings. (*Strickland*, at p. 694.) We may first consider whether defendant suffered any prejudice from the attorney's alleged failings, without determining counsel failed to provide effective representation. (*People v. Cox* (1991) 53 Cal.3d 618, 656, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The standard under the California Constitution for counsel to have obtained a reduced sentence despite mandatory statutory provisions (see, e.g., *Dillon*) requires a showing that Gonzalez's punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.) The showing must demonstrate the punishment is grossly disproportionate in light of (1) the nature of the offense and the defendant's personal characteristics, (2) punishment for more serious offenses, and (3) punishment for similar offenses in other jurisdictions. (*Ibid.*)

The federal standard is virtually identical: "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem*, *supra*, 463 U.S. at p. 292.) While *Solem* held "no one factor will be dispositive in a given case" (*id.* at p. 291, fn. 17), Justice Kennedy has suggested the latter two factors need only be considered if the defendant makes a threshold showing on the first factor that "comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." (*Harmelin*, *supra*, 501 U.S. at p. 1005 (conc. opn. of Kennedy, J.); but see *Nunez*, *supra*, 173 Cal.App.4th at p. 737, fn. 8 [noting this threshold requirement may be difficult to assess in a vacuum, since it "excludes relevant evidence . . . in the judicial determination

20

of contemporary standards of decency"].)  In any event, Gonzalez does not seek judicial notice of or discuss comparative intra- or interjurisdictional punishment.

As before, SB 260 is relevant here in our analysis of Gonzalez's as-applied disproportionality challenge because his effective punishment does not include or even approach life in prison without the possibility of parole.  We conclude that even if counsel had raised the challenge Gonzalez now faults him for omitting, there is no possibility on the record presented on appeal he would have received in the trial court a sentence with an earlier parole eligibility date than under SB 260.  A direct perpetrator acting without any provocation, he personally pulled the trigger to commit first degree murder in a callous, senseless gang "turf" hit, tracking his defenseless victim down after an initial encounter.  His offense with enhancements ordinarily would preclude parole eligibility for 50 years.  Nothing in the record on appeal suggests he was an "unusually immature youth" (*Dillon*, *supra*, 34 Cal.3d at p. 488) or that other mitigating circumstances so diminished his culpability or showed such a likelihood of reform that SB 260's parole date was constitutionally insufficient.  Gonzalez's actions over the next eight years after he murdered Cena demonstrated neither remorse, nor reform, but instead a hardening criminality in committing additional felonies, including assaulting a peace officer.  His appellate challenge therefore fails.[4]

---

[4]     Gonzalez has not filed a habeas petition, and we express no opinion on the merits of such a petition.

21

### III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

I CONCUR:


THOMPSON, J.

BEDSWORTH, Acting P.J., Dissenting:

I respectfully dissent.

This started out as a concurrence. I agree with my colleagues that appellant's sentence is unconstitutional because it is a functional life without possibility of parole sentence. I concur in their assessment that Senate Bill No. 260 (SB 260) should remedy the problem. My only point of disagreement is over how to apply that remedy. That seemed like a concurrence.

Unfortunately, what we cannot agree on is a point that seems to me to threaten appellant with a de facto life without possibility of parole sentence. My colleagues have settled for giving him a very fine legal argument in 25 years. If, when he reaches that point, he is told he gets no parole hearing, his habeas petition should be a very strong one . . . by our lights.

But we will not be hearing the case. And even if we were, the Constitution does not guarantee appellant a good argument; it guarantees him a constitutional sentence. I do not believe the majority opinion provides a guarantee, so I think I have to call this a dissent.

Here's the problem. We all agree appellant's 50-life sentence is unconstitutional. We all agree application of SB 260's provision for a parole hearing in 25 years would make it constitutional. That's a lot of agreement on some difficult issues.

What we disagree about is how to get SB 260 into appellant's sentence. For reasons another panel of this court described in *People v. Solis* (2014) 224 Cal.App.4th 727, I believe the only way to make that sentence constitutional at imposition – which is what I think the law requires – is to make it a part of his judgment. I believe it has to be included as part of his sentence nunc pro tunc. Otherwise, we're not

1

giving him relief so much as telling him we think some future court will give him relief so he shouldn't worry about it. That's more aspiration than resolution.

I think an appellate court has the power to say, "The only way to make this sentence – which is not yet final – constitutional is to apply SB 260 to it, and we therefore order that be done . . . in writing." I think we should do that. My colleagues see it differently.

As my colleagues see it, all legislation "may be repealed or modified in the future" and appellant may even get lucky and benefit from a new law someday that reduces the time before his hearing even further. As they put it, "reviewing courts will assess those changes in due course." (Maj. opn., p. 15.) But that is precisely my concern.

Just last year, in *Doe v. Harris* (2013) 57 Cal.4th 64, our Supreme Court held that, "[T]he general rule in California is that the plea agreement will be '"deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy. . . ."' (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1070). That the parties enter into a plea agreement thus does not have the effect of insulating them from changes in the law that the Legislature has intended to apply to them."

That seems to me a rather clear statement that even if you have bargained with the state for a particular sentence, you roll the dice on legislative changes. How much more precarious the position of a defendant who did not bargain for a sentence, but was merely accorded one by operation of law? I don't think telling appellant "'reviewing courts will assess those changes in due course' and as we see it, they *should* rule in your favor" passes constitutional muster.

Nor did the court in *In re Heard* (2014) 223 Cal.App.4th 115. They correctly pointed out there was a problem here. My colleagues feel it is corrected by

2

their confidence future courts will apply SB 260 and give appellant a parole hearing in 25 years.  But confidence is not the same as a constitutional sentence.

If SB 260 is repealed between now and the vanishingly distant year of 2039, I have little difficulty constructing an argument for the prosecutor in this case who, after removing her jetpack outside the court and downloading her powerpoint onto the teleprompter, will urge, "SB 260 had not been enacted when appellant committed his crime, it was not enacted when he was sentenced, and – having been repealed – is not applicable now.  It simply never applied to him."  I think appellant deserves more protection against that argument than my reassurance in a concurrence that it doesn't seem right.

I think he deserves a sentence that is constitutional *ab initio*.  And I think we can give it to him by amending the judgment by applying present law to it before it becomes final.

My colleagues' response seems to be that "Reviewing courts . . . do not have roving authority to order remand to fine tune a juvenile defendant's sentence with strict proportionality . . . ."  (Maj. opn., p. 6.)  I assume that is a reference to *Solis*, *supra*, in which we ordered the sentence modified to reflect appellant's entitlement to a parole hearing 25 years hence and a new abstract of judgment prepared reflecting that.  But if they are correct that we do not have the power to do that, and if they are correct that no appellate court has the power to do that, then we should admit the sentence is unconstitutional and reverse.

BEDSWORTH, ACTING P. J.

3